**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

(1) TAMMIE PRINCE, as guardian and next friend of D.P., a minor child

      Plaintiff,

v.

(1) INDEPENDENT SCHOOL DISTRICT NO. 25 OF ADAIR COUNTY a/k/a STILWELL PUBLIC SCHOOLS, a Political Subdivision of the State of Oklahoma;

(2) MARK LEA;

(3) LAWRENCE FOURKILLER;

      Defendants.

Case No: CIV-25-154-GLJ

ATTORNEY LIEN CLAIMED

JURY TRIAL DEMANDED

**COMPLAINT[1]**

**COMES NOW** the Plaintiff, Tammie Prince ("Ms. Prince"), as guardian and next friend of D.P., a minor child, by and through her attorneys of record, and for her causes of action against the Defendants, Independent School District No. 25 of Adair County a/k/a Stilwell Public Schools, Mark Lea, and Lawrence Fourkiller, sets forth and states as follows:

**INRODUCTION**

1.    This case pertains to the illegal and predatory sexual behavior of former Stilwell Public Schools ("the District") teacher, Lawrence Fourkiller ("Fourkiller" or "Defendant

---

[1]    Plaintiff previously filed her claims against the District and Defendant Lea on December 20, 2024 in *Prince v. Lea, et al.*, United States District Court for the Eastern District of Oklahoma, Case No. 24-cv-49-GLJ, Dkt. #2 (hereinafter referred to as "*Prince I*"). On April 4, 2025, Magistrate Judge Gerald Jackson entered a Report and Recommendation, recommending that Plaintiff's claims be dismissed without prejudice. *See Prince I*, Dkt. # 9. Shortly thereafter, on April 15, 2025, Plaintiff voluntarily dismissed her claims without prejudice. *See Prince I*, Dkt. # 10. As such, this action is being re-filed within one (1) year pursuant to 12 O.S. §100.

Fourkiller"), and the District's indifferent response to Fourkiller's abusive behavior.

2.     Over a number of years, Fourkiller molested and committed lewd acts, including but not limited to inappropriately touching or feeling the body or private parts of female students at the Stilwell Elementary School, during school hours

3.     While in Fourkiller's 2019-2020 second-grade class, D.P. was one of the many female students at Stilwell Elementary School who were subjected to Fourkiller's predatory behavior.

4.     The following school year, D.P. took the courageous step of reporting Fourkiller's conduct to multiple District employees, including Stilwell Elementary School principal Mark Lea ("Lea" or "Defendant Lea"). Rather than take action to investigate or remediate the abuse, District employees disregarded and dismissed D.P.'s report and instead directed D.P. to stop making accusations about Fourkiller.

5.     Perhaps even more concerning, no one from the District informed Ms. Prince, the Oklahoma Department of Human Services ("DHS"), or law enforcement of D.P.'s allegations regarding Fourkiller. As a result, Fourkiller was not punished and continued to have unfettered access to female students at Stilwell Elementary School, like D.P.

6.     D.P. lived in constant fear, anxiety, and stress while at school, due to her being forced to be in the continual presence of her abuser

7.     In late October 2022, the parents of three (3) students in Fourkiller's 2022-2023 fourth-grade class informed the District's assistant superintendent that their daughters had reported being inappropriately touched by Fourkiller while in class.

8.     And just like with D.P.'s prior report, the District again failed to investigate, report, or act to remediate the abuse.

9.      It was not until March of 2023, when one of Fourkiller's former students reported that while in second grade, she was forced to suck Fourkiller's penis under his desk, during school hours, that the District took any steps to remediate the abuse.

10.     A subsequent FBI investigation uncovered the full scope of Fourkiller's predatory behavior and resulted in Fourkiller being indicted on two (2) counts of aggravated sexual abuse of a child under 12 and eight (8) counts of abusive sexual contact with a child under 12. *See* Superseding Indictment, Dkt. #33, filed in *USA v. Fourkille*r, Eastern District Case No. 23-cr-00106-JFH (hereinafter referred to as the "*Criminal Case*").

11.     The District and Defendant Lea were aware of Fourkiller's predatory behavior towards female students, but failed to address and remedy his abusive conduct, in deliberate indifference to the constitutional rights of female students, like D.P.

## PARTIES, JURISDICTION, AND VENUE

12.     Plaintiff Tammie Prince is, and was,  a resident of Adair County, Oklahoma at all times relevant herein. Ms. Prince is the maternal grandmother and legal guardian of D.P. D.P. is a minor child who attended Stilwell Elementary School at all times relevant herein.

13.     Defendant Independent School District No. 25 of Adair County, a/k/a Stilwell Public Schools (hereinafter "the District") is a political subdivision, organized and existing under the laws of the State of Oklahoma, with its facilities and schools located in Adair County, Oklahoma. The District receives federal funding and is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX").

14.     Stilwell Elementary School, located at 10 S 6th St, Stilwell, OK 74960, is one of the four (4) schools operated by the District.

15.     Upon information and belief, Defendant Mark Lea ("Lea") was and is a resident of

Adair County, Oklahoma, at all relevant times. During all times herein, Defendant Lea was an agent and/or employee of the District acting within the scope, course, and authority of his employment as the Stilwell Elementary School Principal.

16.     Upon information and belief, Defendant Lawrence Fourkiller ("Fourkiller") was a resident of Adair County, Oklahoma, at all times relevant hereto. Defendant Fourkiller is currently in federal custody, incarcerated at at FCI Pekin, which is located at 2600 S. Second St. Pekin, Illinois 61554. During all times herein, Defendant Fourkiller was an agent and/or employee of the District acting within the scope, course, and authority of his employment as a teacher at Stilwell Elementary School.

17.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1334 because the matters in controversy arise under the Constitution and laws of the United States. Specifically, Plaintiff asserts claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.

18.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy arising under the United States Constitution and federal law.

19.     The District was timely placed on notice of the Plaintiff's tort claims in conformance with the Oklahoma Governmental Tort Claims Act, 51 O.S. §156, and this action is being timely filed, pursuant to 51 O.S. §157.

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because several Defendants reside within this Court's judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

21.     Paragraphs 1-20 are incorporated herein by reference.

- **FOURKILLER'S PATTERN OF PREDATORY BEHAVIOR TOWARDS FEMALE STUDENTS**

22.     The District hired Fourkiller in the summer of 2018 to be a second-grade teacher at Stilwell Elementary School.

23.     At the time of Fourkiller's hiring, Defendant Lea served as the Stilwell Elementary School principal and was ostensibly Fourkiller's supervisor.

24.     While teaching at the District, Fourkiller used his classroom as his own personal hunting ground to systematically target, groom, and abuse young female students.

25.     Over the course of four (4) school years, Fourkiller routinely initiated inappropriate physical contact with young female students in and around the Stilwell Elementary School.

26.     Fourkiller's abuses were calculated and generally followed a similar pattern.

27.     He would begin by "grooming" the female students so that they were accustomed to his frequent touching.[2] Fourkiller would accomplish this by rubbing the girls' backs, touching their shoulders, giving them hugs, etc.

28.     As the students grew comfortable with his constant physical touch, Fourkiller would gradually escalate his contact until he was openly molesting the young girls.

29.     One of Fourkiller's victims described Fourkiller's practice in this regard when speaking to law enforcement:

> Victim 10 stated that the defendant was nice at the beginning of the year, but then he started to "rub our backs, but he would always go lower."  Victim 10 stated that

---

[2]     "[S]exual grooming refers to the manipulative behaviors employed by a perpetrator to gain the cooperation of the victim and avoid detection." Jeglic and  Winters, *An analysis of sexual grooming in cases of child sexual abuse by educators*, Children and Youth Services Review (Mar. 2025), https://doi.org/10.1016/j.childyouth.2025.108119

things began to change about a month into the school year. The defendant began to walk past them and touch their heads, then he began to rub their backs and their necks. She stated that these touches made her feel uncomfortable. Victim 10 recalled that the defendant would go lower down and touch their butts and then he would pretend it was an accident – "even though we all knew that he did it on purpose."[3]

30.     Fourkiller executed many of his abuses while female students were sitting on his lap, at his desk, during school hours.[4]

31.     As a matter of practice, during class, Fourkiller would place female students on his lap and begin to rub his hands over the young girls' bodies.

32.     Fourkiller initiated this conduct in front of the other students in his class, and ostensibly in view of District staff and administration.

33.     It is obvious that a male teacher should not be placing second and fourth-grade students on his lap during school hours. However, upon information and belief, no one at the District acted to prevent Fourkiller from doing so.

- **FOURKILLER'S ABUSE AND HARASSMENT OF D.P.**

34.     D.P. was a student in Fourkiller's second-grade class during the 2019-2020 school year

35.     Throughout the 2019-2020 school year, Fourkiller engaged in a pattern of predatory and sexually abusive behavior toward the female students in his class, including D.P.

36.     By way of example, Fourkiller regularly played movies for his class. During these "movie days" Fourkiller would have different female students come to his desk and sit on his lap to watch the movie.

---

[3]     *See, Criminal Case*, Dkt. #57 at p. 4.

[4]     By way of example, four (4) of the ten (10) known student victims reported that they were abused while sitting on Fourkiller's lap.

37.    Fourkiller had D.P. sit in his lap on many such movie days, at which time he would "rub his hands all over her, and then put his hand down her pants and touch her private spot." *See Criminal Case,* Dkt. #57 at p. 6.

38.    During these instances, Fourkiller would place the hand that was not touching D.P. into his pants and touch himself.[5]

39.    While D.P. was sitting on Fourkiller's lap during one such movie day in the spring of 2020, Fourkiller placed his finger into D.P.'s vagina, which caused D.P.'s "privates" to burn so badly that she had to go to the hospital.

40.    After Fourkiller's abuse was reported to the FBI, three (3) other students in D.P.'s 2019-202 second-grade class came forward with similar reports of Fourkiller's predatory behavior. Those three (3) victims described the abuse they suffered during the 2019-2020 school year as follows:

    a.    Victim 4 reported that Fourkiller (1) "would place his hands down her shirt and in her pants when she asked him questions in class"; (2) "would stand behind her at her desk and place his hands down her shirt" and " touch her stomach [] under her clothes"; (3) would make her sit on his lap when she would go to his desk to ask questions, where he "would put his hand down her pants and touch her stomach and upper thigh." *See Criminal Case,* Dkt. #57 at p. 6.

    b.    Victim 5 explained that Fourkiller "would make her and other female students come to hug him before he would allow them to leave the classroom to use the restroom" and that while hugging the minor girls, Fourkiller "would use both hands and wouldn't let go." *Id*. at 7. Victim 5 further reported that "when she would have questions to ask, [Fourkiller] would call her to his desk, spread his legs, then have her stand between his legs and touch her butt." *Id*.

    c.    Victim 6 disclosed that "every time she went to [Fourkiller] to ask for help, he would touch her 'privates.'" *Id*. Victim 6 further described how Fourkiller "would make her sit on his lap and then reach into her pants" and "'put his fingers on' her vagina." *Id*.

---

[5]    D.P. reported that she "could feel [Fourkiller's] hand going up and down" while it was in his pants, as if he were masturbating. *See Criminal Case*, Dkt. #57 at p. 6.

41.     Fourkiller did not attempt to hide his conduct toward the female students in his class, as his abuses took place in front of the other students. Moreover, District staff, particularly District Administrators responsible for supervising Fourkiller, would have been (or should have been) aware of Fourkiller's predatory behavior.

42.     D.P., and the other female students in her second-grade class were spared from further abuse when in-person schooling was suspended in mid-March of 2020 as a result of the COVID-19 pandemic.

43.     Upon returning to in-person schooling the following school year, D.P. informed at least two (2) separate teachers of Fourkiller's abuse.

44.     One such teacher, Amanda Fourkiller, told D.P. to stop spreading lies about Fourkiller because it could ruin his reputation and cause him to lose his job.

45.     District administration was eventually made aware of D.P.'s allegations, which prompted Defendant Lea to call D.P. into his office for a meeting.

46.     During this meeting, D.P. disclosed that Fourkiller routinely called her up to his desk during the 2019-2020 school year and put his hand up her shirt and down her pants.

47.     However, Defendant Lea dismissed D.P.'s report out of hand and instructed her to stop making accusations about Fourkiller. Lea also informed Fourkiller of D.P.'s allegations, which resulted in Fourkiller telling D.P. that he would give her detention if she continued making any such allegations. Upon information and belief to be confirmed in discovery, Fourkiller threatened D.P. with detention in Defendant Lea's presence.

48.     Despite the disturbing details of D.P.'s report, Lea never informed Ms. Prince of his meeting with D.P., or of the fact that D.P. had reported that she was being sexually abused by Defendant Fourkiller.

49.     As a result, Ms. Prince was wholly unaware of D.P.'s allegations and therefore unable to take any affirmative actions to protect D.P.

50.     Even more appalling is that Defendant Lea never reported D.P.'s disclosure to the Oklahoma Department of Human Services ("DHS") or law enforcement, as required by Oklahoma law. *See* 10A O.S. § 1-2-101(B)(1); 70 O.S. §1210.163(A) ("Every school employee having reason to believe that a student under the age of eighteen (18) years is a victim of abuse or neglect shall report the matter immediately to the Department of Human Services and local law enforcement.").

51.     In sum, neither Defendant Lea nor the District took any action in response to D.P.'s report, and instead, allowed Fourkiller to continue teaching, giving him unfettered access to female students, like D.P.

52.     Upon information and belief, during this same time period, the District received notice that Fourkiller possessed pornography on his school computer.[6] However, that incident was similarly brushed under the rug by the District, and Fourkiller continued to have unfettered access to the Stilwell Elementary School students.

53.     Defendant Fourkiller continued to prey on D.P., even after the District had been informed of his sexually inappropriate conduct during the 2019-2020 school year.

54.     Because Stilwell Elementary School is a relatively small school, D.P. frequently came into contact with Fourkiller, even when she was not in his class. Often, during these subsequent encounters, Fourkiller would again rub and/or touch D.P. in a manner that made her uncomfortable.

---

[6]     *See*, Alex Cash, *Stilwell community members react to multiple sex abuse charges of former elementary school teacher*, Fox 23, https://www.fox23.com/news/stilwell-community-members-react-to-multiple-sex-abuse-charges-of-former-elementary-school-teacher/article_31c22736-1d33-11ee-9c73-13c394928dba.html

55.    As a result of the District's refusal to investigate Fourkiller and remove him from the classroom, D.P. frequently encountered Fourkiller while at school. Being in the presence of her abuser on such a regular basis while at school understandably took a significant toll on D.P.

- **FOURKILLER'S CONTINUED ABUSE AND HARASSMENT OF DISTRICT STUDENTS**

56.    Predictably, Fourkiller's abuse of District students continued, with at least two (2) other female students reporting that Fourkiller abused, assaulted, and/or harassed them during the 2020-2021 school year.

57.    One such student, Victim 3 in the Superseding Indictment, reported that Fourkiller would make her sit on his lap. Victim 3 explained that while sitting in Fourkiller's lap, he would touch her upper thighs, near her genitals, and her stomach.[7]

58.    At least four (4) students in Fourkiller's 2022-2023 fourth-grade class reported that Fourkiller abused, assaulted, and/or harassed them during school hours.[8]

59.    In September of 2022, a parent of one of Fourkiller's victims informed Defendant Lea that Fourkiller had been speaking to and touching her daughter inappropriately. Similar to his response to D.P.'s report, Defendant Lea dismissed the allegations as a "he said, she said" situation.

60.    Then, on October 27, 2022, the parents of three (3) other students in Fourkiller's 2022-2023 fourth-grade class informed Assistant Superintendent Matthew Brunk of their daughters' reports that Fourkiller was sexually abusing and/or harassing them.

61.    And yet again, the District failed to act to investigate or remediate the abuse. Just like with D.P.'s prior report, the District failed to inform DHS or law enforcement of the parents'

---

[7]    The other student who was abused by Fourkiller during the 2020-2021 school year (Victim 2 in the Superseding Indictment) is discussed at greater length below.

[8]    *See, e.g.,* Amended Complaint filed in *Child Doe 1, et al. v. Lea, et al*., United States District Court for the Eastern District of Oklahoma, Case No. 6:24-cv-00174-JAR, Dkt. #33.

concerns and allowed Fourkiller to continue teaching at the District.

62.    It was not until March 18, 2023, when the school received yet another report of Fourkiller's illegal behavior, that the District finally took any steps to end the abuse.

63.    On or around March 18, 2023, a student from Fourkiller's 2020-2021 second-grade class (Victim 2 in the Superseding Indictment) reported that over the course of the 2020-2021 school year, Fourkiller held her back from specialized classes like P.E. to get alone time with her. When they were ostensibly alone in his classroom, Fourkiller serially assaulted Victim 2. Victim 2 described the abuse she experienced during a forensic interview as follows:

> Victim 2 disclosed that two years ago, while she was a student in the defendant's second grade class, the defendant had her go under his desk and made her suck his penis. Victim 2 told the interviewer that "there is this thing that basically that he told me something that helped deceive me maybe – he called his penis squishy marker and made me suck it." Victim 2 demonstrated how the defendant would pull his pants down just enough to expose his penis…She described his penis as squishy, and soft. Victim 2 stated that white stuff would come out of the defendant's penis and that he would call it milk. She recalled that "he made me drink it sometimes."[9]

64.    In response to the appalling allegations from Victim 2, the District placed Fourkiller on administrative leave and **_finally_** contacted law enforcement.[10]

65.    A subsequent FBI investigation uncovered the full scope of Fourkiller's predatory behavior and resulted in Fourkiller being indicted on one count of Aggravated Sexual Abuse and five counts of Abusive Sexual Contact on June 14, 2023. _See Criminal Case_, Dkt. #2. On October 12, 2023, a Superseding Indictment was filed, which incorporated the counts in the June 14, 2023 Indictment and added an additional four counts, to bring the total number of counts to ten (10). _See_

---

[9]    _See, Criminal Case_, Dkt. #50 at p. 2.

[10]    The District never contacted Ms. Prince, or the parents who had previously reported Fourkiller's conduct, to inform them of the March 2023 report or to re-consider their prior allegations in light of the criminal investigation.

*Criminal Case*, Dkt. #33 On April 11, 2024, Fourkiller pled guilty to one felony count of Aggravated Sexual Abuse of a Child in Indian Country (Count 2 in the Superseding Indictment). *See Criminal Case*, Dkt. ## 73, 75.

66.    On October 30, 2024, Fourkiller was sentenced to 420 months (35 years) in BOP custody. *See Criminal Case*, Dkt. #92.

- **THE DISTRICT'S FAILURE AND/OR REFUSAL TO INVESTIGATE FOURKILLER AND PROTECT STILWELL ELEMENTARY SCHOOL STUDENTS**

67.    Despite being aware of Fourkiller's predatory behavior, the District and Defendant Lea wholly failed and/or refused to investigate his conduct and thereby allowed Fourkiller to have unfettered, unsupervised access to Stilwell Elementary School students, including D.P.

68.    The deliberate indifference of Defendant Lea in failing to investigate, remediate, and report Fourkiller's misconduct was in furtherance of and consistent with customs and/or practices that were promulgated, created, and/or implemented by the District.

69.    The District's deficient customs and practices resulted in a culture of indifference which allowed sexual predators, like Defendant Fourkiller, to prey on Stilwell Elementary School students.

70.    By way of example, the District's failure to respond to the reports about Fourkiller is foreseeable in light of its failure to abide by several requirements of Title IX.

71.    For instance, there is no indication that the District had designated a Title IX coordinator, as required by federal law.[11]

72.    According to a Dear Colleague Letter, issued by the Department of Education's

---

[11]    *See*, 34 C.F.R. § 106.8(A) (School districts "must designate and authorize at least one employee to coordinate its efforts to comply with its responsibilities under this part, which employee must be referred to as the 'Title IX Coordinator.'").

Office for Civil Rights on April 24, 2015, the responsibilities of a Title IX Coordinator include the

following:

> The Title IX coordinator is responsible for coordinating the recipient's responses to all complaints involving possible sex discrimination. This responsibility includes monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate. Such coordination can help the recipient avoid Title IX violations, particularly violations involving sexual harassment and violence, by preventing incidents from recurring or becoming systemic problems that affect the wider school community.
> …
> The Title IX coordinator must have knowledge of the recipient's policies and procedures on sex discrimination and should be involved in the drafting and revision of such policies and procedures to help ensure that they comply with the requirements of Title IX. [12]

73.     Pursuant to Federal law, the District was required to provide "the name or title,

office address, electronic mail address, and telephone number of the employee or employees

designated as the Title IX Coordinator" to all "students, parents or legal guardians of elementary

and secondary school students." 34 C.F.R. § 106.8(A).

74.     Title IX regulations further required that school districts ensure that Title IX

Coordinators are appropriately trained and possess comprehensive knowledge regarding the

district's responsibilities under Title IX.[13] Additionally, "[a]ll materials used to train Title IX

Coordinators" must be publicly available on the school district's website.[14]

75.     The District did not provide the identity or contact information for any Title IX

---

[12]    *See*,    Dear    Colleague    Letter    on    Title    IX    Coordinators, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf

[13]    *See*, 34 C.F.R. § 106.45(b)(1)(iii).

[14]    *See, id*. at §106.45(b)(10)(i)(D). The Sexual Harassment Policy also dictated that "[t]he district will also post the training materials used to train Title IX coordinators, investigators, and decisionmakers on the district website."

Coordinator prior to Fourkiller's July 2023 arrest. Nor did the District provide access to any materials used to train the Title IX Coordinator on its website.

76.     With no Title IX coordinator, the District ostensibly did not employ anyone who had the requisite knowledge or training regarding how to investigate sexual harassment or appreciate the signs of sexual abuse.[15]

77.     The Dear Colleague Letter makes clear that one of the purposes of a Title IX Coordinator is to ensure that school districts have at least one employee who has received training regarding the investigation and handling of sexual harassment complaints.[16]

78.     Because the District had not designated anyone to act as Title IX, it can be reasonably inferred that the District did not employ anyone who had been appropriately trained regarding the District's responsibilities to investigate sexual harassment and abuse, pursuant to Title IX.

79.     It is foreseeable that failing to employ an individual who is sufficiently trained to investigate sexual harassment and abuse pursuant to Title IX, will result in a school environment whereby students are not protected from sexual abuse.[17]

80.     Had the District appointed an appropriately trained Title IX Coordinator, District

---

[15]     It appears that the District realized its failures regarding the implementation of Title IX following Fourkiller's June 2023 arrest, as the Stilwell Board of Education voted to appoint an official Title IX coordinator during a July 26, 2023 meeting.

[16]     *See,* Dear Colleague Letter, *supra* note 14, at p. 2 ("the most egregious and harmful Title IX violations occur when a recipient fails to designate a Title IX coordinator or when a Title IX coordinator has not been sufficiently trained.").

[17]     *See,* Dear Colleague Letter, *supra* note 14, at p. 2 ("In our enforcement work, OCR has found that some of the most egregious and harmful Title IX violations occur when a recipient fails to designate a Title IX coordinator or when a Title IX coordinator has not been sufficiently trained or given the appropriate level of authority to oversee the recipient's compliance with Title IX.").

administrators would have been required to fully investigate the allegations and provide written findings from the investigation.

81.     However, because the District failed to initiate a formal investigation, there were no written findings from its investigation, making Fourkiller's predatory conduct impervious from internal review.

82.     Furthermore, Title IX requires that after learning of a sexual harassment allegation, "[a] school must offer supportive measures that 'are designed to restore or preserve equal access to the [school's] education program or activity.'"[18]

83.     Guidance issued by the United States Department of Education dictates that following an allegation of sexual harassment "[t]he Title IX Coordinator must promptly contact the complainant to discuss the availability of supportive measures, regardless of whether a formal complaint is filed, and to explain the process for filing a formal complaint."[19]

84.     "Examples of supportive measures include 'counseling, extensions of deadlines or other course related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures."[20]

85.     Despite the foregoing, the District failed to provide any supportive measures to D.P. after she reported the abuses she suffered.

---

[18]     *See*, Questions and Answers on the Title IX Regulations on Sexual Harassment (Updated June 28, 2022) at p. 18, United States Department of Education, (citing 34 C.F.R. § 106.30(a), https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf

[19]     *See, id.* at p. 13.

[20]     *See, id.* (citing 85 Fed. Reg. at 30,401).

86.     It was not until the beginning of the 2023-2024 school year – after Fourkiller had been indicted in the *Criminal Case* and after the District had finally appointed a Title IX coordinator – that the District reached out to Ms. Prince to offer any supportive measures for the abuses D.P. had suffered in the preceding years.

87.     While it is unclear as to who the Title IX coordinator was the times relevant herein, one thing is certain: Defendants Gaskins, Brunk, and Lea had no idea how to appropriately address reports that a District employee had sexually harassed/abused a student.

88.     As a result, District administrators, like Defendant Lea, were left to investigate sexual harassment/abuse allegations and respond however they saw fit.

89.     Placing the responsibility of investigating allegations of sexual harassment/abuse on administrators who are untrained and otherwise incapable of doing so, resulted in a sexual assault investigation system whereby a site principal was permitted to unilaterally determine whether a complaint was sufficiently "sexual" to trigger an investigation.

90.     Finally, the District failed to ensure that its administrators and staff were aware of their responsibilities under 10A O.S. § 1-2-101(B)(1) and 70 O.S. §1210.163(A), to report allegations of sexual abuse to law enforcement and DHS.

91.     In sum, the District's policies, practices, and customs resulted in a school environment where children were placed in the care of a known predator, with no supervision or protection.

▪ **IMPACT OF UNCHECKED HARASSMENT ON D.P.**

92.     Given the Defendants' deliberate indifference in refusing to investigate Fourkiller and remove him from the classroom, D.P. was forced to be in the presence of her abuser all day, every day, while at school.

93.    The fear, anxiety, and stress D.P. experienced in having to be in the presence of her abuser was greatly enhanced by the District's failure and/or refusal to do anything in response to her prior reports to the District.

94.    The District's failure to protect D.P. from Fourkiller after being made aware of his predatory behavior made it such that D.P. could not feel safe while attending school at Stilwell Elementary School.

95.    In sum, D.P. was deprived of a normal childhood education due to the Defendants' failure to provide a safe learning environment for D.P. while at Stilwell Elementary School.

96.    As a direct and proximate result of the educational environment created by the Defendants' deliberately indifferent response to the sexual assault and subsequent harassment, D.P. has suffered and continues to suffer psychological damage, emotional distress, loss of standing in her community, damage to her reputation, damage to her relationships, and she has lost educational opportunities.

## CAUSES OF ACTION

### COUNT I - VIOLATION OF TITLE IX
### (20 U.S.C. § 1681, *ET SEQ.*)
### *AS TO THE DISTRICT*

97.    Paragraphs 1 through 96 are incorporated herein by reference.

98.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

99.    "All Oklahoma school districts, as recipients of federal funds, are subject to the

requirements of Title IX."[21]

100.    As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.[22]

101.    Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

### a. *Deliberate Indifference to Known Sexual Harassment (Escue)*

102.    "Deliberate indifference to known acts of harassment ... amounts to an intentional violation of Title IX, capable of supporting a private damages action."[23]

103.    A school district is liable for violating Title IX "(1) only if the [school] remains deliberately indifferent to acts of harassment of which it has actual knowledge (2) the harassment was reported to an appropriate person ... with the authority to take corrective action to end the discrimination, and (3) the harassment was so severe, pervasive and objectively offensive that it ... deprived the victim of access to the educational benefits or opportunities provided by the school."[24]

104.    The District, through its administration and officials, had actual knowledge of the sexual assaults committed by Defendant Lawrence Fourkiller.

---

[21]    See, *Jane Doe No. 2 v. Oologah-Talala Indep. Sch. Dist. No. 4 of Rogers Cnty., Oklahoma*, No. 21-CV-240-TCK-SH, 2022 WL 16557607, at *11 (N.D. Okla. Oct. 31, 2022).

[22]    *See*, *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1053 (10th Cir. 2023) ("The discrimination on the basis of sex that Title IX prohibits includes sexual harassment.").

[23]    *See*, *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 643 (1999) (citing *Gebser v. Lago Vista Independent Sch. Dist.,* 524 U.S. 274 (1998)).

[24]    *See*, *Escue v. N. OK Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006) (internal citations and quotations omitted).

105.    At all relevant times herein, Defendant Lea had the capacity and authority to take remedial action to correct the sex-based harassment.

106.    The abuse and/or harassment suffered by D.P. was sufficiently severe and pervasive to create an abusive and sexually hostile educational environment that deprived her of access to educational opportunities and benefits provided by the District.

107.    The District was obligated to address these reports, as teacher-on-student sexual assault and harassment are forms of sex discrimination prohibited by Title IX.

108.    The District was also obligated to address these reports under Title IX because the District had control over the teacher who sexually assaulted and harassed D.P., as well as the context in which the assaults and harassment occurred—namely, at Stilwell Elementary School.

109.    The District and its administration, including Defendant Lea, had actual knowledge of Lawrence Fourkiller's predatory sexual behavior, yet failed to investigate or discipline Lawrence Fourkiller in a timely manner and consistent with federal and state law.

110.    The individuals with actual knowledge, including Defendant Lea, had the authority and ability to investigate and take meaningful corrective action to end/prevent sexual assaults and harassment of D.P., but failed to do so.

111.    The District failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward D.P.

112.    Examples of the District's deliberate indifference includes, without limitation:

   a) Failing to take meaningful action to correct the conditions causing the sexual harassment and to prevent recurrence of the harassment;

   b) Failing to report suspected sexual assault in violation of, and as mandated by, Title IX;

   c) Failing to inform Ms. Prince or D.P. of their rights under Title IX or to direct the Ms. Prince and D.P. to a Title IX coordinator; and

d) Failing to provide D.P. any corrective measures after being made aware of her allegations regarding the abuses she suffered while attending Stilwell Elementary School.

113.    The District's "response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances."[25]

114.    Given the District's deliberate indifference, D.P. was deprived access to the educational benefits and/or opportunities provided by the District.

- ***Hostile Education Environment / District's Policy of Deliberate Indifference (Simpson)***

115.    According to the Tenth Circuit, a school district can also be held liable under Title IX if it possesses an "official policy" of "deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of" Title IX.[26]

116.    Here, the District had implemented a Title IX system that was devoid of a Title IX Coordinator. As a result of having no Title IX Coordinator, the District had no employees who were aware of and/or capable of handling sexual harassment/abuse complaints.

117.    With no Title IX Coordinator to facilitate the investigation and handling of sexual harassment/abuse complaints, administrators, such as Defendant Lea, were left to investigate and address sexual harassment/abuse allegations however they saw fit.

118.    Moreover, it is clear from this incident that the District had wholly failed to train

---

[25]    *See*, *Davis*, 526 U.S. at 648.

[26]    *See*, *Simpson v. University of Colorado, Boulder,* 500 F.3d 1170 (10th Cir. 2007); *see also Miles v. Washington*, No. CIV-08-166-JHP, 2009 WL 259722, at *3 (E.D. Okla. Feb. 2, 2009) ("it can be deliberate indifference if a school fails to provide adequate training that is obviously necessary for the implementation of a program and that an official policy of the school can result from a situation where the school exercises significant control over the harasser and the environment in which the harassment occurs.") (citing *Simpson,* 500 F.3d 1170).

its administrators, staff, and agents in their responsibilities and

119.    In total, the District's deficient Title IX system resulted in credible sexual harassment/abuse allegations not being investigated and/or responded to.

120.    The District's deficient Title IX system made D.P. more vulnerable to the predatory behavior of Lawrence Fourkiller.

121.    The District's deficient Title IX policies and practices constituted disparate treatment of females and had a disparate impact on female students like D.P.

122.    Given the District's deliberate indifference, D.P. was deprived access to the educational benefits and/or opportunities provided by the District.

123.     As a direct and proximate cause of the District's actions, D.P. suffered emotional distress, psychological damage, and her character and standing in the community have suffered from the harassment fostered because of the District's deliberate indifference to her rights under Title IX.

### COUNT II - VIOLATION OF THE FOURTEENTH AMENDMENT'S PROMISE OF EQUAL PROTECTION
### (42 U.S.C. § 1983)
### (AS TO THE DISTRICT AND MARK LEA)

124.    Paragraphs 1-148 are incorporated herein by reference.

125.    Under the Equal Protection Clause of the Fourteenth Amendment, D.P. had the right to equal access to an educational environment free from harassment and discrimination on the basis of sex.

#### a.    Individual/Supervisory Liability of Defendant Lea

126.    An individual school official violates the Equal Protection Clause and is subject to liability under § 1983, where the official exhibits "deliberate indifference to known sexual

harassment."[27]

127.    Defendant Lea had actual knowledge of the sexual harassment and abuse committed by Defendant Fourkiller.

128.    Defendant Lea had the authority and ability to investigate and take meaningful corrective action to end/prevent sexual assaults and harassment of D.P. but failed to do so.

129.    Defendant Lea violated D.P.'s rights to equal protection by:

a)  Subjectively dismissing D.P.'s allegations regarding Fourkiller and failing to take any action to investigate her claims;

b)  Failing to take immediate and appropriate actions to investigate and/or remedy sexual harassment occurring at Stilwell Elementary School;

c)  Failing to report D.P.'s allegations of abuse to the appropriate authorities, as required by Oklahoma law;

d)  Failing to take prompt and effective steps to end sexual harassment, prevent its recurrence, and address its effects, whether or not the sexual harassment is the subject of a criminal investigation;

e)  Failing to provide an adequate grievance procedure for students to file complaints of sexual discrimination, including complaints of sexual violence.

130.    Defendant Lea failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward D.P.'s right to equal protection.

131.    D.P., and other female students, and particularly those female students who were victimized by Defendant Fourkiller, were intentionally treated differently than similarly situated District students, because Defendant Lea failed to promptly and effectively address and remedy instances of sexual harassment at the hands of Fourkiller, and thereby tolerated his sexual harassment, and enabled Fourkiller to engage in continued sex discrimination/harassment of

---

[27]    *See*, *Murrell v. School District No. 1*, 186 F. 3d 1238, 1250 (10th Cir. 1999).

female students, including D.P.

132.    By failing to take any steps to investigate, address, and/or remedy the known sexual abuse and/or harassment, Defendant Lea acted with deliberate indifference toward D.P.

133.    Defendant Lea's failure to respond to the alleged sexual abuse and/or harassment promptly and appropriately resulted in D.P. being excluded from participation in, being denied the benefits of, and being subjected to discrimination in the District's education program, on the basis of her sex

### b.  Municipal / "Monell" Liability against the District

134.    In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) the U.S. Supreme Court recognized that a municipality may be held liable for damages under § 1983.

135.    Applying *Monell*, the Tenth Circuit in Murrell explained that a school district may be liable for sexual harassment suffered by a student under § 1983 when a school "employee's discriminatory actions are representative of an official policy or custom of the [school district] or are taken by an official with final policy making authority." *Murrell*, 186 F.3d at 1249.

136.    There is an affirmative causal link between the abuses suffered by D.P. and the policies, practices, and/or customs that were promulgated, created, and/or implemented by the District.

137.    Such policies, practices, and/or customs include, but are not limited to:

   a)  failing to report suspected sexual misconduct to law enforcement;

   b)  failing to properly investigate criminal misconduct against students;

   c)  discounting the credibility of students' allegations;

   d)  failing to enact policies that require adherence to reporting requirements;

    e) failing to adequately train and supervise employees regarding the investigation and reporting of sexual abuse of students; and

    f) failing to train and supervise teachers, employees, and/or agents as to the requirement of reporting suspected sexual assault to the appropriate authorities.

138.    Moreover, Defendant Lea's failure to address reports of sexual abuse and/or harassment occurring within the district, as described *supra*, was causally connected with the aforementioned policies, practices and/or customs.

139.    By fostering the aforementioned policies, practices, and/or customs, the District created an environment in which female students, such as D.P., were exposed to an increased risk of sexual abuse.

140.    The District had knowledge (either actual or constructive knowledge), or it was obvious, that the sexual harassment/abuse policies, practices, and/or customs in place at Stilwell Elementary School posed substantial risks to the health and safety of students like D.P.

141.    Despite this knowledge, the District failed to take reasonable steps to alleviate the known and obvious risks, in deliberate indifference to the rights of female students like D.P.

142.    The District, through its continued encouragement, ratification, and ratification, and approval of the aforementioned policies, practices, and/or customs, in spite of its known and/or obvious inadequacies, was deliberately indifferent to female students', including D.P.'s, Fourteenth Amendment rights.

143.    D.P., other female students, and particularly those female students who were victimized by Lawrence Fourkiller, were intentionally treated differently than similarly situated District students, because the Defendants failed to promptly and effectively address and remedy instances of sexual harassment at the hands of Lawrence Fourkiller, and thereby tolerated his sexual harassment, and enabled Lawrence Fourkiller to engage in continued sex

discrimination/harassment of female students, including D.P..

144.    The District's policies and/or practices constituted disparate treatment of females and had a disparate impact on female students.

145.    Defendants' actions, or lack thereof, were the proximate cause of D.P.'s emotional distress and psychological damage, and their character and standing in the community have suffered from the harassment fostered as a result of the District's deliberate indifference to their right to equal protection under the Fourteenth Amendment.

146.    D.P. has suffered emotional distress and psychological and physical injuries, and their character and standing in their community have suffered from the harassment fostered as a direct and proximate result of the Defendants' deliberate indifference to her rights under the Fourteenth Amendment.

### COUNT III - VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS RIGHTS
### (42 U.S.C. § 1983)
### *(AS TO THE DISTRICT AND DEFENDANT LEA)*

147.    Paragraphs 1 through 146 are incorporated herein by reference.

148.    D.P. had a clearly established constitutional right to personal security, bodily integrity, due process, and physical safety, all protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

149.    Through their actions and inactions, described herein, the District and Defendant Lea created and/or increased D.P.'s vulnerability to the danger of being sexually assaulted by Defendant Fourkiller.

150.    At all pertinent times, D.P. was a member of a specifically definable group, namely, minor female students at Stilwell Elementary School.

151.    The District, through its staff and administrators, including Defendant Lea, created

and/or increased D.P.'s vulnerability to the danger posed by Lawrence Fourkiller through numerous affirmative acts, including but not limited to:

a) Encouraging D.P. to stop making reports of Fourkiller's abuse;

b) Advising D.P. that reporting Fourkiller's abuse would damage his reputation and result in him losing his job;

c) Responding to reports of abuse by taking steps with the goal of protecting the District rather than investigating the truth of the complaints;

d) Ignoring numerous allegations of sexual misconduct by Fourkiller;

e) Not immediately removing Fourkiller from campus after receiving notice of his misconduct;

f) Continuing to allow Fourkiller unfettered and unsupervised access to students;

g) Not investigating allegations of misconduct by Fourkiller and/or

h) Not immediately reporting the allegations of misconduct to law enforcement and/or the students' parents.

152. These affirmative actions taken by District staff placed D.P. and other female students at Stilwell Elementary School at a substantial risk of serious, immediate, and proximate harm. That risk included being abused while attending Stilwell Elementary School.

153. These affirmative acts by the District, taken as a whole and in the context of known abuse in the District, increased the danger to D.P. and amount to egregious and outrageous behavior.

154. The risk of danger posed by Defendant Fourkiller was obvious or known to the District and Defendant Lea, due to the numerous reports they had received from students and parents.

155. The District acted recklessly and in conscious disregard of the risk, thereby creating an opportunity for D.P. to be abused by Fourkiller.

156.    The District and Defendant Lea's actions and inactions created an opportunity for Fourkiller to continue to abuse D.P. and other female students at Stilwell Elementary School, as those actions stripped necessary aid from D.P. and others.

157.    When viewed in total, the affirmative actions taken by the District and Defendant Lea were conscious shocking.

158.    The affirmative actions taken by District staff, which created and/or increased D.P.'s vulnerability to danger, were done in furtherance of and consistent with policies, customs, and/or practices that had been promulgated, created, and/or implemented by the District.

159.    Such policies include:

a)  Allowing District employees accused of sexual harassment/abuse to remain on campus;

b)  Allowing students to remain in classrooms occupied by employees accused of sexual harassment/abuse;

c)  Continuing to employ staff members accused of sexual harassment/abuse, such as Fourkiller, and allowing them unfettered, unsupervised interaction with students;

d)  Allowing untrained administrators to conduct investigations into staff members accused of sexual harassment/abuse;

e)  Discounting the credibility of students' allegations in favor of the staff members accused of sexual harassment/abuse.

160.    The District had knowledge (either actual or constructive knowledge), or it was obvious, that the above-identified policies, practices, and/or customs posed substantial risks to the personal security, bodily integrity, and physical safety of District students.

161.    The District's lacking policies, practices, and customs encouraged further and ongoing abuse by sending the message to Lawrence Fourkiller that the District tacitly approved of his unwanted contacts with female students and would not interfere in any way.

162.    The affirmative actions of the District in promulgating the above-referenced

policies, practices and/or customs, increased the danger to D.P. and when viewed in total, are conscience-shocking.

163.    The actions of the District and Defendant Lea were arbitrary, capricious, and wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning.

164.    As a result of the actions and inactions of the District and Defendant Lea, D.P. was deprived of a safe learning environment free from unwanted sexual conduct and further deprived of her rights to an educational environment free from harassment. D.P. further suffered damages, including counseling and/or medical expenses, severe emotional distress, humiliation, embarrassment, attorneys' fees, and costs to address the conduct set forth above.

### CLAIM IV - NEGLIGENCE
### (51 O.S. § 151, *ET SEQ.*)
### (AS TO THE DISTRICT)

165.    Paragraphs 1-164 are incorporated herein by reference.

166.    The District owed D.P. a duty to provide a safe educational environment free from sexual abuse, sexual assault, sexual harassment, and sexual predatory behavior by its teachers and coaches.[28]

167.    The District, by and through its employee(s), staff or agents breached these duties by failing to take any remedial action to correct, eliminate, and/or prevent the recurrence of the sexual harassment described above once its employees perceived, knew or had reason to believe that Defendant Fourkiller posed a risk of sexual harassment, sexual misconduct, and sexual assault to District students.

168.    Despite District policy requiring that an investigation be conducted into allegations

---

[28]    *See*, *J.W. v. Independent Sch. Dist. No. 10 of Dewey Cnty.*, 2021 OK CIV APP 34, 500 P.3d 649.

of sexual misconduct, District administration failed and/or refused to do so.

169.    The actions of District administration, including Defendant Lea, were taken in the course and scope of his employment with the District.

170.    The District is liable for the actions of District administrators, including Defendant Lea, pursuant to the Oklahoma Government Tort Claim Act, 51 O.S. § 151, *et seq.*

171.    The District further breached its duties to D.P. by violating of one or more Oklahoma Statutes, including, but not limited to 70 O.S. §1210.163 and 10A O.S. § 1-2-101(B)(2)(a), by failing to promptly alert the appropriate authorities of the alleged sexual harassment/assault.

172.    D.P. are in the class of persons intended to be protected by the above referenced Oklahoma statutes related to school safety. The statutes and ordinances the Defendants violated were intended to prevent the harassment suffered by D.P.

173.    The District also owed a duty to D.P. and all other students to hire qualified, competent employees to teach, coach, and supervise the students of that community. The District similarly owed a duty to train and supervise any and all employees in how to supervise and protect students.

174.    The District breached its duty by:

   a)   Failing to supervise Fourkiller after receiving reports of sexual misconduct, sexual harassment, and sexual assaults from other students;

   b)   Failing to train its employees and/or agents regarding policies and procedures related to sexual harassment, sexual misconduct, and sexual assault; and

   c)   Failing to protect D.P. and other female students from harm while in the District's control or control of its agents and/or employees.

175.    These breaches were the actual and proximate cause of D.P.'s injuries.

176.    As a result of the District's negligence, D.P. has suffered psychological damage,

emotional distress, loss of standing in their community, damage to their reputation, their future relationships have been negatively affected, and they have lost educational opportunities and actual damages in excess of seventy-five thousand dollars ($75,000.00).

Respectfully submitted,

SMOLEN | LAW, PLLC

*John W. Warren*
Donald E. Smolen, II, OBA#19944
John W. Warren, OBA #33635
611 S. Detroit Ave.
Tulsa, OK 74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
jack@smolen.law
*Attorneys for Plaintiff*